IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DAVID STEBBINS                                                                              PLAINTIFF

              v.                         Civil No. 12-3022

BOONE COUNTY, ARKANSAS;
and SHERIFF DANNY HICKMAN                                                  DEFENDANTS


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, a former inmate of the Boone County Detention Center (BCDC), brings this case asserting claims under the Americans with Disabilities Act (ADA) and 42 U.S.C. § 1983. He maintains Defendants discriminated against him in various ways because of his disability, Asperger's Syndrome,[1] and failed to make reasonable accommodations for him. Additionally, he asserts his constitutional rights were violated when Defendants failed to provide him with a safe environment.

Jury demands have been made by both sides. On April 22-April 23, 2014, a pre-trial evidentiary hearing was held to determine whether issues triable to a jury existed. At the hearing, the Court heard the testimony of the following witnesses: (1) Jason Day; (2) Danny Hickman; (3) David Stebbins; (4) Morris Davis; (5) John Edgmon; (6) Jason Baethke; (7) Robert King; (8) Tina Avery; (9) Brandon Starnes; (10) Timothy Porras; (11) Tim Roberson; (12) Rita Stebbins; and (13) Jason Jones.

---

[1] "Asberger's syndrome is a developmental disorder that affects a person's ability to socialize and communicate effectively with others." http://www.mayoclinic.org/diseases-conditions/aspergers-syndrome/basics/definition/con-20029249 (accessed July 7, 2014).

-1-

Post-hearing the parties were directed to brief the issue of exhaustion of administrative remedies. Additionally, the record was left open to allow Stebbins to submit a copy of the court order setting aside or expunging his conviction of a battery offense.

## 1. Background

On November 24, 2011, Plaintiff was in an altercation with his Father. The police arrived and Plaintiff was arrested and charged with domestic battery and disorderly conduct. As a result of his arrest, Plaintiff was placed in the BCDC.

For purposes of discussion, I will summarize the testimony of the witnesses. The summary is not meant to be verbatim.

### David Stebbins

Stebbins testified that he had been diagnosed with Asberger's Syndrome in the fifth grade. He stated that the disorder makes it difficult for him to function in social settings. He indicated that he had not been on medication for the disorder since 2008 and did not believe the lack of medication caused him any problems.

Because of his disorder, Stebbins testified that he did not often go out. Additionally, once he was incarcerated he testified the disorder made it difficult for him to decide whether fellow inmates were joking or not.

Stebbins testified he was incarcerated in the BCDC on two separate occasions. First, he was incarcerated from November 24, 2011, until March 14, 2012. He was again incarcerated there from July 27, 2012, to September 12, 2012, on a bond revocation. Prior to this, Stebbins testified he had never been incarcerated.

-2-

Stebbins testified that he was arrested by Deputy Jason C. Beathke[2] on Thanksgiving, November 24, 2011. Stebbins called the police and Beathke was the responding deputy. Stebbins believes Beathke arrested him and not his Father because Beathke was biased against him. Stebbins maintains he was handcuffed and put in the squad car before Beathke even went into the house. Stebbins testified that Beathke completely ignored his version of the events. Based on Beathke's use of Stebbins' Mother's first name, Stebbins believed Beathke had some type of personal relationship with her.

According to Stebbins, the bias stemmed from his prior *pro se* lawsuits. Stebbins believes Beathke conspired with his Father. Stebbins testified that he was living with his parents at the time because he had "hit rock bottom."

According to Stebbins, his Father punched him in the face and then made slow careful cuts on his own forehead. Stebbins suspected that his Father went to these lengths because he wanted Stebbins to quit filing lawsuits.

Prior to this, Stebbins testified he had no criminal record only a few traffic tickets. Stebbins eventually pled nolo contendere to a misdemeanor charge of battery in the third degree. He maintains his conviction for the misdemeanor charge of battery in the third degree has been set aside. Stebbins has submitted an order filed May 12, 2014, granting his request to seal his file pursuant to Ark. Code Ann. § 16-93-301 (2014). Doc. 160 at pg. 14.

While he was incarcerated, Stebbins testified he lost many lawsuits. Stebbins maintains that as soon as Jason Jones[3] saw that Stebbins was incarcerated he started harassing him.

---

[2] Beathke is not a named Defendant.

[3] Jason Jones was voluntarily dismissed from this lawsuit on August 13, 2012 (Doc. 28).

-3-

Stebbins testified that Jones was constantly making physical threats against him and trying to get other inmates to attack him. According to Stebbins, it was the custom of the Boone County to completely ignore inmate allegations against officers.

On November 26th, Stebbins submitted a grievance stating he had been threatened by his cell mates. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1. Specifically, he reported that the inmates were threatening to beat him up if he did not respect them. *Id.* For his protection, Stebbins was moved. *Id.*

In response to a November 29th grievance he submitted about Jones harassing him and retaliating against him, Stebbins was asked to be specific and describe Jones' actions. *Defts' Ex.* 2. The following day, November 30th, Stebbins submitted a grievance stating that he had been deprived of his right to talk to his attorney "simply because the officer hates me." *Defts' Ex.* 3. In response, Day wrote that Stebbins had called his attorney at 8:44 a.m. *Id.* Stebbins testified that the response was inaccurate because he did not speak to an attorney.

On December 14th, Stebbins testified that Jones did not allow him out of his cell for breakfast. *See also Defts' Ex.* 4. Stebbins stated that Jones was cursing at him, insulting him, threatening physical injury including bashing his head against the stone wall.

In response, Day noted that the statements from the inmates who witnessed the event were totally different than Stebbins' report. *Defts' Ex.* 4. Stebbins testified that several of the witnesses were shady and in his view the investigation was shabby and lazy. *Id.*

That same day, Stebbins submitted a grievance asking for an immediate response. *Defts' Ex.* 5. He asserted that he was being harassed by the inmates. *Id.* In response to the grievance,

-4-

Day wrote that Stebbins was moved for his peace of mind. *Id.* Stebbins testified that the move was just to the top tier in a different cell and it did not help.

Stebbins testified that the following day was hectic and things got out of hand. Stebbins reported that his dinner tray was stolen but Jones responded that he was told Stebbins' had given it away.

As he was mopping up spilled juice, Stebbins stated he was being harassed. *Defts' Ex.* 6. The mop bucket was pushed in front of Stebbins and he pushed it back at Inmate Newman. *Id.* In response Stebbins said that Newman took the wringer portion of the mop bucket and threw it at Stebbins' face breaking his glasses and giving him a black eye. *Id.* In addition to the black eye, Stebbins had two small lacerations. *Court's Ex.* 1 at pg. 14 (color photograph).

Criminal Investigation Division (CID) investigator Bob King investigated the incident and it was determined that both Stebbins and Newman would be charged with disorderly conduct. *Defts' Ex.* 6. Newman was also charged with battery in the third degree for the injuries Stebbins sustained. *Id.*

On December 19th, Stebbins submitted a statement form in which he complained of constant harassment by other inmates which included mopping around his feet, spraying him with glass cleaner, and pelting him with food particles. *Defts' Ex.* 6.

On February 6, 2012, Stebbins submitted two separate grievances complaining that Inmate Edgmon was making profanity laced insults towards Stebbins and had threatened to kill him. *Defts' Exs.* 8 & 9. In response, Stebbins testified that he was moved to B pod and given one of the only single cells in the jail.

-5-

Stebbins testified he was interrogated about Asberger's Syndrome.  He did not ask for any accommodation because he believed it was so obvious that he needed it.  He points out the harassment and threats he had to endure.  He asserts that he should not be punished for conduct caused by his disease.  It is his belief that he was punished for having the disorder.

**Jason Day**

Jason Day testified that he is the jail administrator of the BCDC.  On November 26th, Day wrote the following memo:

> David Stebbins was brought to our facility for intake.  Officer Jason Jones called me and said Stebbins had sued him before and that he wanted limited dealings with him.  Jones stated he felt this would be best because of how Stebbins is so quick to file frivolous lawsuits and has issues with Jones.
>
> I advised Jones to have limited dealings with Stebbins as his job would allow.

*Plaintiff's Exhibit* (hereinafter *Plft's Ex.*) A(2).  Day testified that Jones had to do his job but that it would be best to let other guards go through the pod.  Every time Jones got in Stebbins' vicinity, Day testified that Stebbins would complain that Jones looked at him wrong, threatened him, badgered him, or assaulted him.

The BCDC has a video surveillance system.  There is no audio.  Video footage can be viewed at pod control.  There was also an intercom system but they had some problems with it.

If there was something that needed to be investigated, the issue was turned over to the CID.  CID keeps records of their investigations.

When Day would view the camera footage, all he saw was guards doing their jobs.  Day stated that BCDC personnel do not always make a notation that video footage had been

-6-

reviewed. Video footage is preserved if it shows a dangerous situation such as a fight or something like the mop bucket incident.

On December 14th, Stebbins submitted a grievance maintaining that Jones had deprived him of breakfast by not releasing his door until it was too late to eat. *Plff's Ex.* B(1)(c). Stebbins also asserted that Jones continued to be biased against him. *Id.* According to Day, Stebbins reported that Jones had threatened to kill Stebbins and said that Stebbins would not be able to walk out of the jail. Day indicates two or three statements from other inmates directly contradicted Stebbins' version of the events. Day could not recall if this grievance was sent to CID for investigation.

Day recalled that on December 15th a mop bucket was thrown in Stebbins' face. There were four guards on duty. Two guards responded and one of the two was Jones. Day testified that Jones did have minimal contact with Stebbins but it was his job to break up a fight. In Stebbins' case since he maintains the Defendants were biased, the incident was turned over to CID for investigation.

Day testified that they were constantly moving Stebbins for his own protection. The inmates would tell the guards that they had to get Stebbins out of there or there was going to be an issue. Stebbins would get in verbal altercations. When other inmates complained and made threats against Stebbins he would be moved for his own safety. Day indicated they had nothing but problems with Stebbins.

Day testified he knew Stebbins had Asberger's Syndrome. Day indicates Stebbins advised the BCDC either when being booked in or shortly thereafter. However, Day could not recall Stebbins asking for any kind of accommodation.

-7-

Stebbins was in the BCDC on two separate occasions. While they had made accommodations for individuals with physical disabilities, this was the first time someone with this developmental disorder was incarcerated at the BCDC.

Day testified that he had Stebbins in his office two or three times. During these visits, Stebbins would go off on tangents. Stebbins reported Jones was harassing him but Day could never get Stebbins to give him any specifics regarding the harassment. Day interview inmates and officers but no one recalled Jones harassing Stebbins.

On February 21, 2012, Stebbins complained about Deputy Mendez's conduct during a visitation Stebbins was having with his Mother. The grievance, *Plff's Ex.* E(8), indicates that Stebbins complained because his Mother was unable to hear him. Stebbins asked to be moved to another visitation station. Mendez initially refused to move her because he said he tested the equipment himself and it was fully operational. According to Stebbins, Mendez threatened to cancel the visitation. Stebbins asserted that Mendez was retaliating against him. Eventually, after Stebbins threatened to file a grievance, Mendez moved Stebbins' Mother.

Day testified that he believed they moved Stebbins six or seven times to different cells and/or different cell blocks. Every time he was moved, Stebbins would have trouble. The BCDC has three one man cells and two intoxication tanks. Day told Stebbins he could be put in a one man cell but Stebbins never asked to be moved there.

### Danny Hickman

Hickman testified hat he was the County Sheriff during Stebbins' incarceration. Hickman served as the Sheriff for fourteen years. Day, as jail administrator, helped put together the main part of the BCDC's policies. However, his work had to be approved by Hickman. If

-8-

there was a complaint against Day, Hickman testified it would be handled by Chief Deputy Roberson and would eventually come to him as Sheriff.

Hickman testified that officers go a twelve week training course at the Law Enforcement Academy in Camden, Arkansas.  After an officer is hired, the county has one year to send the new officer for training.  A portion of the twelve week training course covers not letting anger, bias, or prejudice influence an arrest or any other action.

Hickman testified that each arrest is different.  Hickman stated that the officers have to secure the person being arrested as well as the scene.  Hickman testified that the arresting officer has some input into the amount of bond set; however, the bond was set by either the prosecutor or the judge.  Hickman stated that he knew Stebbins had been arrested and charged with domestic battery in the second degree and pled to a misdemeanor charge of domestic battery in the third.

Prior to Stebbins' complaint, Hickman could not recall receiving any complaints against Baethke.  Hickman testified that Baethke was a good hard working officer.  Following his arrest, Stebbins submitted a complaint.  *Plff's Ex.* D(2)(b).  While Hickman could not actually recall Stebbins' letter complaint, he testified that it was his belief that it would have been turned over to Roberson for investigation.

During the period of time Stebbins was incarcerated there, Day stopped by the Sheriff's office a few times.  Hickman could not recall anything being said about Asperger's Syndrome

-9-

**Morris Davis**

Davis is currently incarcerated in the Arkansas Department of Correction. On December 14, 2011, Morris testified he was incarcerated in the BCDC. In fact, Morris indicated he had been incarcerated at the BCDC for three years.

On December 14th, Davis was sitting on a table in C-pod. Davis testified he heard a commotion coming from B-pod. He stated that he heard Jones scream out Stebbins' name. Davis reported that he heard Jones say: "You [expletive omitted] I will beat you so hard you will be lucky to crawl out of here." Davis testified he heard Jones say that Stebbins had filed a lawsuit against him. Davis also indicated he was aware of the fact that other inmates had threatened Stebbins.

Davis testified that Stebbins was in his cell for a period of time. According to Davis, Stebbins was "not working with a full deck." Davis said Stebbins would get nervous and upset and his agitation was shown through his body language. Davis believed that Day should have found out what Stebbins' problem was.

**John Edgmon**

Edgmon testified that he at one point had a disagreement with Stebbins. Edgmon could not independently recall Jones yelling at Stebbins in B-pod on December 14th. However, he did recall writing a statement over the incident where Stebbins contended his cell door was never opened so he could eat. *Plff's Ex.* B(2)(c). Jones' contention was that the cell door had been unlocked but Stebbins had not come out to get his tray. *Id.* When Jones left, Edgmon wrote that Stebbins said Jones did not know who he was messing with and that Stebbins had something for Jones. *Id.*

-10-

Edgmon testified he was in the same pod when the mop incident occurred.  Edgmon stated that Stebbins threw the mop bucket at another inmate and it was thrown back.  He recalled that Plaintiff was taken to be medically checked out.

According to Edgmon, there was more than one occasion when Stebbins did not come out of his cell to get breakfast saying that he did not want it.  Breakfast was at 3:30-4:00 am. The meals were brought into the pod.

**Jason Beathke**

Beathke testified that he is currently a trooper with the Arkansas State Police.    In November of 2011, he was employed by the Boone County Sheriff's Office.

Beathke recalled arresting Stebbins on November 24, 2011.  Stebbins called and reported being punched in the face.  When Beathke arrived at the home at approximately 10:55 pm, Stebbins' Father was on the front porch.

Stebbins told Beathke that his Father had punched him in the face and then cut himself so he would not go to jail.  The Father reported that Stebbins was angry because he had cut off his Internet access.  He stated that Stebbins came into the bedroom and tried to stab him.  The Father indicated he had used a pillow as a shield.

Beathke testified that he was aware of the fact that Stebbins had a disability.  Beathke had responded to the house on another occasion on a complaint of loud music.

Beathke testified that he walked through the home for thirty to forty minutes looking for evidence.  He found a pillow with blood on it, saw some blood stains on the floor, and found a ten inch long kitchen knife with a serrated edge. The knife had blood on it.  Pictures were taken of blood stains on the floor and of the pillow.

-11-

Beathke testified that Stebbins was rambling, very emotional, and did not tell a consistent story.  Based on the evidence, Beathke made the decision to arrest Stebbins.

**Bob King**

King testified he is Captain of the CID of the Boone County Sheriffs Department.  At the request of Day, King investigated the incident between Stebbins and Newman involving the mop bucket.  *See Court's Ex.* 1.

King testified he reviewed camera footage of the incident.  He interviewed two inmates and had two statements from jail staff.  King also interviewed both Stebbins and Newman. Stebbins reported that he was getting upset and flailing his arms.  Stebbins admitted flinging the bucket at Newman.

King indicated his understanding of the incident was that Newman caught the wringer and deflected it back using force.  Newman said it merely bounced off his arms.  Based on the video, King concluded that Newman's version of the events was not totally accurate.  King charged both Stebbins and Newman with disorderly conduct and also charged Newman with battery.  *See Plff's Ex.* A(3); *Court's Ex.* 1.

When King interviewed Stebbins about the mop bucket incident, Stebbins told King about Jones threatening him and about the harassment he had been enduring.  Normally an internal investigation had to be authorized by the Sheriff.  However, King considered this to be part of Stebbins' allegations regarding the mop bucket incident. Stebbins reported that Jones had threatened him with physical harm .  King found Stebbins' allegations with respect to Jones to be unsubstantiated.  King testified that he took statements from inmates and jail staff.  King did not review any camera footage.

-12-

**Tina Avery**

Avery testified she had been a corporal at the BCDC.  She could not recall whether in December of 2011 she and Jones were of the same rank or if he was under her.

At times, Avery testified that she and Stebbins got along.  Avery knew that the control room was referred to as the bubble.  In fact, she testified Stebbins had on occasion called her the bubble lady.

Avery testified that the control room is at the center of the jail.  It is surrounded by the pods and B-pod is about eight feet from the control room.  Avery testified that Jones' conduct never raised any red flags for her.  Although there are sometimes raised voices, Avery testified that if she heard an employee threaten to beat an inmate, she would report it.

On December 15th, an altercation in B-pod was reported.  At the time, Avery was looking under the desk in an effort to determine why the computer and power box were not functioning properly.  Jones went to B-pod and directed Newman and Stebbins to stay away from each other and advised Stebbins that he could stay in his cell if he felt safer.  It took no more than three to four minutes to get the situation under control.  It was BCDC protocol to escort the inmate to holding.  The next morning, after consulting Sergeant Silva, Stebbins was moved into G-pod. *See Defts' Ex.* 19.

Avery had no recollection of the incident where Stebbins alleged Jones did not release his cell door so that he could get out to eat his breakfast.

**Brandon Starnes**

Starnes testified that he is a sergeant at the BCDC.  Starnes sated that he had no recollection of he and Stebbins having an issue.  Starnes could recall several instances of Avery

-13-

and Stebbins being involved in a verbal back and forth.  Additionally, Starnes testified there were several disrespectful grievances.

Starnes recalled Avery locking Stebbins down in December of 2011.  He believed it was because Stebbins was disrespectful in a grievance he wrote to Avery.  Starnes testified that Avery was very justified in locking Stebbins down.  Starnes indicated Avery had the right to lock down a disrespectful inmate for two days.

According to Starnes, all inmates had the right to submit grievances.  If an inmate did not agree with the response he received, there was a procedure to appeal the decision.

**Timothy Porras**

Porras testified that he was a detention officer at the BCDC.  There are no firearms allowed in the detention center.  Properly certified personnel were allowed to carry tasers and spray.

**Tim Roberson**

As Chief Deputy, Roberson testified he is over the captain who supervises patrol deputies.  Roberson indicated he had not seen the November 24, 2011, report regarding Stebbins' arrest.

After reviewing the report, Roberson testified he would have been upset if Beathke had not charged Stebbins with battery in the second degree.  Roberson noted that Beathke also did a probable cause report.  Roberson stated it was not unusual for an officer to include more detail in a second report.

Roberson testified he was not aware of any allegations of bias being made against Beathke.  In fact, Roberson testified he was not aware of any complaints of any kind being made

-14-

against Beathke while he was at the BCDC. Any such complaints would start with the line supervisor. If the issue was serious, it would move up the chain of command.

Roberson testified that the Sheriff's Office has a code of ethics. *Defts' Ex.* 20. Each officer signs the law enforcement code of ethics. Roberson did not know if jail guards were given the same policy. Roberson stated that officers have been disciplined for violating policies.

Roberson had never seen a letter Stebbins wrote to Sheriff Hickman about Beathke's decision to arrest Stebbins and not his Father. *See Plff's Ex.* D(2)(b). However, upon reviewing it, Roberson would not have considered it a complaint; rather, he considered it a disagreement with Beathke's decisions.

### Rita Stebbins

Rita Stebbins testified that she is Stebbins' Mother. Rita[4] testified that a lot of Stebbins' conduct stems from his Asberger's Syndrome. Rita described it as being a social disability. She testified that Stebbins was easy to anger. There were times when he immediately exploded.

She testified that there were several incidents of Stebbins assaulting family members. She indicated Stebbins had animosity towards his Father. She recalled that he would argue with his sister. One time, Rita stated Stebbins came out and started hitting her over the head with a fishing rod. On another occasion, Rita testified that Stebbins assaulted her in the kitchen. At the time, she had been trying to correct Stebbins. He got so angry that his mind blocked out what he was doing.

---

[4] To avoid confusion, the Court will refer to Rita Stebbins by her first name.

Several years ago, Rita testified that Stebbins became upset about a meal they were eating at Silver Dollar City. The incident resulted in Stebbins' Father striking him a couple of times. She testified that her husband had a restraining order against Stebbins.

In 2011, Rita indicated that she and Stebbins' Father had allowed Stebbins to live with them but he had to sign a written agreement. On November 24, 2011, Rita testified she was not at home when the altercation between Stebbins and her husband occurred. She was at work. She went home at 11:00 p.m. when she got off work. The only one at the house at that time was her husband.

Rita remembered there being blood stains on the wall in the computer room and probably on the carpet. There was also a small amount of blood on a pillow.

Rita testified that her husband had lacerations from his forehead to the mid-crown. He now has scars on his scalp. The scars can be seen because he is going bald. She testified that one scar was about two inches long. Her husband refused to go to the hospital the evening of the incident. She testified the cuts were superficial but since the layer of epidermis is so thin scars resulted.

She referred to the knife used as a flimsy bread knife. To Rita, the selection of this knife indicated that not a lot of thought had gone into it. Despite it being flimsy, Rita testified the knife was capable of inflicting serious injury. She also noted that Stebbins had no background in the use of weapons.

Rita believes Stebbins attacked his Father. However, she also believes that Stebbins was convinced that it occurred the way he stated.

-16-

As to whether Beathke knew her, Rita testified that he had never visited in her home but probably knew her first name because she had been employed as a cashier in a number of businesses over the years.

**Jason Jones**

Jones testified he was a former jailer at the BCDC and owner of a local professional wrestling business.  Stebbins had previously sued Jones in connection with the business alleging a failure to accommodate him under the ADA.  Jones testified that the case was settled for nuisance value.

Jones testified he was working as a jail guard when Stebbins was arrested.  At the time, Jones' shift started at 6:00 a.m.  As an officer, Jones testified you are there to uphold the law, enforce policies, and to tell  the truth.  Jones stated that everyone has a right to file grievances.

On Stebbins' first full day in jail, Jones indicated he went into the holding cells to administer medication.  According to Jones, Stebbins did a "double flip off" towards Jones by extending the middle finger on both hands.  Jones spoke with Day and made a request to have minimum contact both verbally and physically with Stebbins.  *Plff's Ex.* A(2).

With respect to Stebbins' claim that Jones deprived him of breakfast on December 14th, Jones testified that it was simply not true.  Jones stated that breakfast is served in different pods at different times.  Inmates are given notice via intercom that it is breakfast time and the cell doors are released one tier at a time.  If an inmate does not get up and get it, they are not offered breakfast a second time.  Jones testified that Stebbins slept in that day.

-17-

Jones testified that he did his best to walk on egg shells around Stebbins.  Jones knew Stebbins had filed a number of lawsuits.  With respect to Edgmon, Jones stated that he attended the same school but was two years older.

Jones testified he never threatened Stebbins with physical injury.  Jones stated he never urged other inmates to hurt Stebbins.  He indicated you had to take Stebbins with a "block of salt."

On December 15th, Jones was in the control room when the intercom button in pod B-8 went off.  *Court's Ex.* 1 at pg. 9.  Stebbins reported that he was being harassed and had been hit with a mop bucket.  *Id.*

Jones testified that a male guard usually responded to any altercation between male inmates.  It was understood that the guard closest would respond.

Jones went to B-pod to see what the situation was.  *Court's Ex.* 1 at pg. 9.  He told Stebbins and Newman to separate.  *Id.*  Stebbins had a scratch below his eye and Jones advised him to wash it off.  *Id.*  He gave Stebbins an iodine wipe and antibiotic ointment.  *Id.*

Jones then spoke with both inmates.  *Court's Ex.* 1 at pg. 9.  According to Jones, the following was reported to him:

> **Inmate Newman** said that when the told Stebbins not to sling the mop on the window he had just cleaned, that Stebbins started swinging the mop and toilet brush around and hit him with the toilet brush.  Newman then pushed the mop bucket at Stebbins.  Stebbins flipped the top of the mop bucket off at Newman.  Newman blocked it by sticking his arm out and the bucket top bounced back hitting Stebbins in the cheek area (below the eye)

> **Inmate Stebbins** said that he did strike inmate Newman with the toilet brush and then Newman hit him with the mop bucket.  and this was a conspiracy of the other inmates in B-pod were out to get him

-18-

*Id.*

Jones testified that six people in the pod stated this was how the incident occurred. *Court's Ex.* 1 at pg. 9.   He interviewed two inmates outside the pod and the others in their cells.

### 2.  Applicable Standard

A pretrial evidentiary hearing may be utilized to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Johnson v. Bi–State Justice Center, 12 F.3d 133, 135 (8th Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). When both sides present evidence, the procedure "resembles a summary judgment motion with live evidence." Id.   The Court must avoid credibility determinations, believe the Plaintiff's evidence, and draw all justifiable inferences in the Plaintiff's favor. Id. at 136.

### 3.  Discussion

As noted above, Stebbins contends the Defendants violated the ADA by not making reasonable accommodations for him.  He also contends his civil rights were violated.

### (A).  The ADA

"Title II [of the ADA] provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010)(citation omitted). The ADA applies to correctional facilities.  *See Pennsylvania Department of Corrections v. Yeskey*, 524 US. 206 (1998)(Applying Title II of the ADA to prisons).  "[D]eliberate refusal of prison officials to accommodate [an inmate's] disability related needs in such fundamentals as

-19-

mobility, hygiene, medical care, and virtually all other prison programs" may constitute a violation of Title II." *United States v. Georgia*, 546 U.S. 151, 157 (2006).

Reasonable accommodations must give a disabled prisoner meaningful access to the prison program in question. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

> Of course, the right to reasonable accommodations is not absolute. Correctional facilities are not liable for failing to provide accommodations which were not requested, nor are they required to provide preferential treatment to disabled inmates. Moreover, a defendant may defeat a Title II claim by demonstrat[ing] that the requested accommodations would constitute an undue burden. Title II does not require jails or prisons to take actions that unduly jeopardize their safety and security.

*Maxwell v. Olmsted County*, 2012 WL 466179, 6 (D. Minn. 2012)(citations and internal quotations marks omitted); *see also Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)(detention facility "cannot be found liable for failing to provide unsolicited accommodations").

Here, Stebbins did not ask for reasonable accommodations. Instead, he maintains his need for reasonable accommodations should have been obvious because of the repeated problems he was having. As a matter of law, Stebbins claim fails. Under the ADA, Stebbins must request reasonable accommodation.

Moreover, Stebbins concedes he was moved multiple times following verbal altercations with, or threats made by, inmates. Stebbins does not suggest what other accommodation could conceivably be made.

-20-

**(B).  Exhaustion of Administrative Remedies**

Defendants raised at the hearing for the first time the issue Stebbins' failure to exhaust his administrative remedies.  Specifically, they maintain that Plaintiff never appealed any of the grievance responses.

Stebbins maintains inmates were not given the slightest notice that such a remedy exists. However, he concedes the grievance forms themselves state that an inmate may appeal a response.  He asserts that he was completely unaware of the fact that there was any appeal of Day's decisions.

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Exhaustion is mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  In *Jones v. Bock,* 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  *Id.* at 218 (internal quotation marks and citation omitted).  The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Id.* "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction."  *Lenz v. Wade*, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

-21-

A number of grievance forms have been submitted to the Court as exhibits.  The appeal language on some forms says: "If you would like to appeal the response; you may do so by filling out another Grievance and it will be decided by the Sgt. or Cpl. that shift and/or Jason Day (Jail Administrator).  *See Defts' Exs.* 1-2, 4-5, 8-12, 14-17.  This statement is the same whether or not the form was signed by Day as the responding officer.  *See Defts' Exs.* 2, 4-5, 15.

Other forms say: "If you would like to appeal the response; you may do so by returning this form with the back section completed.  The Appeal will be decided by Corporal Neckles or Jason Day (Jail Administrator)."  *Defts' Exs.* 3, 13,  Again the statement appears at the bottoms of forms signed by Day as the responding officer.  *Defts' Ex.* 3.

Given these ambiguities, the Court declines to decide this case based on the exhaustion of remedies defense.  At least with respect to the grievance forms signed by Day as responding officer, it is readily understandable why Stebbins did not believe there was another level of review.

### (C) Eighth Amendment Claim

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

In this circuit, the deliberate indifference standard of the Eighth Amendment is applied to all conditions of confinement claims whether the claims are brought by a pretrial detainee or a convicted prisoner.  *See Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate

AO72A
(Rev. 8/82)

indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc.); *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same.").

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.   The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).  Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, utilities, and safety.

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element.  *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." Id.  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Taking as true the testimony of Stebbins and the witnesses he called, there are no issues of fact triable to the jury.  The undisputed testimony reveals that:  Stebbins was moved on a

-23-

number of occasions to different pods and/or cells because of verbal altercations with inmates or threats of physical injury;  Jones' request to have minimal contact with Stebbins was honored to the extent it could be; and  CID was called upon to investigate the mop bucket incident as well as Stebbins' claim regarding Jones' conduct.

Moreover, the claims asserted by the Plaintiff are official capacity claims against Sheriff Hickman and Boone County.  Of course, "[c]laims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights." *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998)(internal quotation marks and citation omitted).

"An official policy is a deliberate choice to follow a course of action made from among various alternatives by an official who is determined by state law to have the final authority to establish governmental policy."  *Elder-Keep v. Aksamit*, 460 F.3d 979, 967 (8th Cir. 2006)(internal quotation marks and citation omitted).  "Alternatively, liability may be established through proof that the alleged misconduct was so pervasive among the non-policy making employees of the [County] as to constitute a custom or usage with the force of law." *Crawford v. Van Buren County,* 678 F.3d 666, 669 (8th Cir. 2012)(internal quotation marks and citation omitted).  Additionally, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Alexander v. Hedback*, 718 F.3d 762, 766 (8th Cir. 2013)(citation omitted).

Contrary to Plaintiff's belief, Defendants are not liable under § 1983 for "everything and anything" occurring at the facility.  The Defendants cannot be held liable solely based on the actions of its employees. *Kuha v. City of Minnetonka*, 365 F.3d 590, 603 (8th Cir. 2003).  Nor

-24-

can Defendants be held liable based on his general responsibility for supervising the actions of the prison. *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Stebbins failed to produce any evidence suggesting that an "unconstitutional policy or custom [caused] a constitutional violation of a federally protected right or privilege." *Elder-Keep*, 460 F.3d at 987.

### **4.  Conclusion**

For the reasons stated, I recommend this case be dismissed with prejudice based on Stebbins' failure to establish that there on any issues of fact triable to a jury.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of July 2014.

/s/ *J. Marschewski*
_____
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)