US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF ARKANSAS**

JUL 2 5 2014

**DAVID STEBBINS**                                                                            **PLAINTIFF**
CHRIS R. JOHNSON, Clerk
By

VS.                                          **CASE NO. 12-3022**
Deputy Clerk

**BOONE COUNTY, AR**                                              **DEFENDANTS**

## OBJECTION TO REPORT & RECOMMENDATION

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following objection

to the Magistrate Judge's Report & Recommendation, recommending the case be dismissed with

prejudice.

1.       In this Objection, Plaintiff will make the following remarks about how the Magistrate

Judge's findings and recommendations are incorrect:

   (a)      The Magistrate Judge clearly has a bias against Plaintiff, a bias which he has

   demonstrated on numerous occasions.

   (b)      The Magistrate Judge has failed to issue a recommendation on about 2/3 of Plaintiff's

   claims, instead opting to just make claims up that he can refute, instead.

   (c)      The Magistrate Judge completely omitted about a third of the relevant testimony and

   about half of the relevant exhibits when he lists the testimony of each witness.

   (d)      The Magistrate Judge made extremely vague claims about undisputed facts.  It was

   hard for Plaintiff to even figure out what he was saying in those claims.

   (e)      Even so, the Magistrate Judge's finding that these testimonies are "undisputed" is

   patently false.

   (f)      Also, the Magistrate Judge is a filthy liar when he says that Plaintiff has not produced

   "any evidence" suggesting a policy or custom of violating inmates' rights.

   (g)      Just to make sure that the District Judge will not make up brand new reasons, entirely

out of thin air, to throw this case out, Plaintiff will cover each essential element of the offense

that the Magistrate Judge did NOT issue a discussion on, just to prove, conclusively, that

Plaintiff is indeed entitled to a jury trial.

### THE BIAS AND THE IGNORED CLAIMS

2.      Magistrate Judge James R. Marchewski has repeatedly demonstrated that he hates

Petitioner's guts and wants Petitioner out of his hair.

(a)      He repeatedly takes forever to rule on simple motions, such as applications for leave

to proceed in forma pauperis.  He will wait until Plaintiff files a petition for writ of

mandamus, and only then will he rule on the motions.

(b)      He will make up defenses – just make them up – that the opposing parties never

raised (thus becoming a legal advocate on their part) so he'll have an excuse to throw

Plaintiff's claims out.

(c)      He will completely ignore – just deliberately not take into consideration at all, not

merely find unpersuasive – various legal arguments that Plaintiff cites to support his claims.

That way, he does not have to side with Plaintiff on those claims.  For an example of this type

of behavior, see Doc. 150 in this case.

(d)      At the evidence hearing, he would repeatedly hold Plaintiff to blatant double

standards.  Plaintiff is not talking about "pinning the burden of proof on Plaintiff and not

equally on the Defendants" type of double standards, either.  No, he means actual double

standards that the law does NOT require, such as …

i.      Being courteous and respectful to the Defense counsel (Day 1 at 03:44:28 –

03:44:34), while being impatient and agitated with every little thing Plaintiff did (Day 2

at 00:01:49 – 00:02:20, a modest request that would not even delay the hearing, but

Marchewski angrily denied it like he thought Plaintiff was asking him to shove a stick up his butt).

ii.      Requiring – rather aggressively – Plaintiff to answer the Defense's questions how the Defense wanted them to be answered (Day 1 at 04:23:29 – 04:23:57), but allowing the Defense to give vague answers and Plaintiff would not even be allowed to so much as ask clarification questions.  See Day 1 at 00:28:51 – 00:29:17.

iii.      Not allowing relevant evidence (which was plainly admissible under Federal Rule of Evidence 803) for no other reason than, he just did not care (See Day 1 at 03:13:37 – 03:13:51, while allowing evidence that was blatantly inadmissible (under Federal Rule of Evidence 410) to be admitted against Plaintiff, for no other reason than, he just wanted it to be admitted (See Day 1 at 03:39:14 – 03:39:56)

iv.      Despite repeatedly stating – prior to the evidence hearing – that he must "avoid credibility determinations," the Magistrate Judge nevertheless told Stebbins – immediately after the testimony of John Edgmon – that he was indeed fully prepared to make credibility determinations on the jury's behalf.  See Day 1 at 05:42:20 – 05:42:38.

3.      In this Report & Recommendation, he demonstrates this hatred for Plaintiff, yet again.

4.      He issues his recommendation, but completely ignores three essential claims that he cannot refute.  He does not even ATTEMPT to offer any recommendation on them.  The three claims in question are are …

(a)      Plaintiff's Motion for Partial Summary Judgment (issued in-person to the Magistrate Judge on April 23, 2014.  See Day 2 at 2:24:37 – 2:25:44) asking for $370 in compensatory damages because the Defendants cited Petitioner for disorderly conduct without probable cause.

(b)     His claim that Petitioner was only arrested in the first place so that prosecuting attorney Wes Bradford could have a chance to persecute Petitioner in order to coerce him into dismissing lawsuits.

(c)     His claim that the Boone County Jail repeatedly punished Petitioner for conduct they plainly knew to be caused by his Asperger Syndrome.

5.      Instead, the Magistrate Judge... rather spontaneously... just made up two brand new causes of action that never were part of this case to begin with.  He just *made them up*!  These made-up causes of action are:

(a)     That the Defendants failed to move Petitioner around the jail for protection against other inmates.

(b)     That the Defendants failed to provide reasonable accommodations for Petitioner's Asperger Syndrome (as opposed to simply not punishing Petitioner for it).

6.      Judge Marchewski has *clearly* shown that, to him, persecuting a *pro se* litigant who files a large number of lawsuits is far more important than helping a helpless person who has been tortured into insanity (see the attached statement from Larry Boyd for details).

7.      However, to the extent that the Magistrate Judge has entered a report & recommendation, Plaintiff hereby submits the following objections:

## BACKGROUND

8.      The Magistrate Judge starts out reciting the testimony of the witnesses.

9.      While there is no testimony that the Magistrate Judge put in his Report & Recommendation that was outright false, there IS some testimony that was at the evidence hearing that the Magistrate Judge did not include in his Report & Recommendation that he should have.  The Magistrate Judge chose to completely ignore these pieces of evidence, simply

because he can, which is even more proof that he simply just has a vendetta against Plaintiff.

10.    In the following section, Plaintiff will go through each witness and provide the additional testimony that the Magistrate Judge has (most likely intentionally) overlooked.

### David Stebbins

11.    The Magistrate Judge – because he would rather leave a person who has been tortured into insanity to rot, than allow a person who has filed lawsuits in the past to have court access – chose not to include the following testimony from Plaintiff himself:

12.    Plaintiff produced a total of five (5) exhibits or sets of exhibits, outlining five (5) different occasions where the jail guards repeatedly failed to accommodate Plaintiff's legal rights. These incidents included, but were not limited to ...

(a)    On November 24, 2011, Jason Jones was harassing Plaintiff within earshot of Jason Day, and Jason Day, despite being close enough to hear the harassing comments, clearly did not step in, of his own accord, to put a stop to Jones' harassment, consistent with his duty to intervene as set established in Putman v. Gerloff, 639 F. 2d 415, 423 (8th Cir. 1981). See Plaintiff's Exhibit D(1)(d) and the accompanying testimony found on Day 1, 02:46:01 – 02:47:40, where plaintiff explains the significance of this map.

(b)    A jail guard not caring about sexual harassment, but instead, making the impossible-to-follow suggestion that Plaintiff simply "stay away from his cell," so that she would not have to get out of her chair to actually do her job. See Plaintiff's Exhibits E(3)(a) & E(3)(b). See also the accompanying testimony offered on Day 1, at 02:50:31 – 02:51:43.

(c)    An instance where Plaintiff's shower soap was stolen while he was in court. The jail guards did not care (because they were too lazy), and instead simply suggested that Plaintiff protect his own property, even when he was in court and thus couldn't protect it. See

Plaintiff's Exhibit E(4) and the accompanying testimony on Day 1, at 02:51:56 – 02:53:17.

(d)       A complaint where Avey threatened to kill Plaintiff, and Jason Day declined to enter any investigation whatsoever, simply on the grounds that Avey says the accusations were false.  See Plaintiff's Exhibit E(5) and the accompanying testimony at 02:53:20 – 2:56:34.

   i.       There is something especially worth noting about this block of testimony. Notice, at 02:54:36 – 02:54:53.  In response to an objection placed by the Defense Counsel, Marchewski stated that Plaintiff was "trying to show a pattern of abuse." This eliminates the possibility that Marchewski's failure to include this evidence in his Report & Recommendation was in good faith. He plainly admitted that he knew exactly what relevance all this evidence had, so his failure to include it is, at this point, inexplicable by any means other than pure malice.

(e)       Records of two separate incidents, where the jail applied two completely opposite "policies." This clearly showed that the jail only cared about ruling against Plaintiff, not actually applying the jail's real, true rules. See Plaintiff's Exhibits E(7)(a) & E(7)(b), and the accompanying testimony at 02:57:10 – 02:58:39.

(f)       A report against jail guard Freddie Mendez, where Mendez was accused of threatening to revoke Plaintiff's visitation privileges if Plaintiff continued to exercise his First Amendment right to complain, an act which was in blatant violation of the precedents of Regan v. Taxation With Representation of Wash., 461 U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59-60, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006); Rutan v. Republican Party of Ill., 497 U.S. 62, 78, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); and Memorial Hospital v. Maricopa County, 415 U.S.

250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974).  See Plaintiff's Exhibits E(8).  Despite alleging a

very clear constitutional claim, there is no evidence that Jason Day disciplined Mendez in

any way.

13.     Plaintiff also testified that the jail guards never underwent any kind of thorough

investigation when faced with an accusation of officer misconduct.  They would simply ask the

jail guard or a handful of other inmates if the accusation was true.  If they denied that the

accusation was true, then the jail administration would not investigate further.

14.     Plaintiff also testified that two of Jones' most vexatious acts of harassment – those which

occurred on November 25, 2011, and those which occurred on December 14, 2011 – were so

loud, and done in such close proximity to Jason Day's office (note:  the Dec. 14 incident was

farther away from Day's office, but was much, much louder, so it balances out), that Jason Day

most certainly could hear the harassment and threats with his own ears.  Thus, Jason Day at that

point took on a duty to intervene on his own initiative, without any grievances needing to be

filed.

15.     Plaintiff testified that all types of jail guards – not just Jones – would repeatedly violate

Plaintiff's legal rights.  A few examples which did not have exhibits attached to them are listed

below:

   (a)     When John Edgmon was threatening to kill Plaintiff, Plaintiff attempted to advise

   Jailor Pete Nickels of these threats.  Neckels simply replied "Have fun with that," and left the

   pod.  See Defense Exhibits 8 & 9, and the accompanying testimony on Day 1 at 04:02:01 –

   04:03:34.

   (b)     There have been numerous times when Plaintiff filed grievances against inmates for

   harassing him, and Jason Jones would just ball those grievances up and throw them in the

trash.  See the testimony on Day 1, 04:32:10 – 04:33:01.

(c)      When Plaintiff attempted to file a grievance regarding a lost breakfast tray (different incident than on December 14, 2011), Neckels took the grievance, handed it right back to Plaintiff, and did not even file it.  Nickels would do the same thing with the appeal grievance Plaintiff tried to file in response to that violation, saying that Plaintiff's grievance filing "ain't doing shit."  Only when he could see Plaintiff writing a letter to his attorney to bring a civil action against the jail, only then did he take the grievances, and only submit ONE of them to Jason Day, while the appeal grievance just disappeared off the face of the earth.  See day 1, 04:33:03 – 04:34:40.

(d)      When Plaintiff filed a grievance against Timothy Porrez, Porrez came storming into Plaintiff's cell, threatening Plaintiff ***at gunpoint*** and daring Plaintiff to repeat the contents of the grievance to Porrez' face.  See Day 1, 02:32:15 – 02:33:37.

16.      This is all relevant testimony that Marchewski himself freely admitted that he must believe ("[T]he court must apply the proper standard of proof, avoid credibility determinations, ***believe the inmate's evidence***, and draw all justifiable inferences in the inmate's favor" See Doc. 151, Page 3, Lines 10-12.  See also Doc. 132, Page 1).

### Jason Day

17.      The Magistrate Judge made a conscious and malicious choice (See ¶ 13(d)(i) of this Objection) to omit the following testimony from his Report:

18.      Jason Day freely admits that he receives complaints *all the time* from inmates containing allegations of harassment, verbal abuse, and even threats coming from officers, and by his own admission, he does not look into them, but rather, will not step in unless there is *physical* abuse coming from the officers.  See Day 1 at 00:28:06 – 00:28:33.

19.     Jason Day also admits that, although the allegation of the death threat was *turned over* to the CID for investigation, he does not believe there was, in fact, an investigation about it. See Day 1 at 00:53:40 – 00:54:08.

20.     Last but not least, Jason Day states that the order for minimum contacts – which was dated November 26, 2011 and introduced as Plaintiff's Exhibit A(2) – was entered the same day that Jones requested it, meaning that, according to him, Jones requested the minimum contacts on November 26, 2011.  Remember that point, as it will be important in ¶ 56 of this objection.

### Danny Hickman

21.     In addition to the testimony recited by the Magistrate Judge, the following testimony is also relevant (and was obviously omitted from the report, so he could have an excuse to recommend that Mr. Lawsuit's claim be thrown out; See ¶ 13(d)(i) of this Objection).

22.     Danny Hickman states that he knows what things go into a police officer's training.  That being said, he testifies that police officers in the State of Arkansas are trained to exercise discretion in three areas:

(a)     To arrest a suspect only after viewing all evidence in their immediate range (in other words, officers have discretion to arrest suspects before conducting reasonably thorough investigations that take into consideration the totality of the circumstances).  See Day 1, 01:39:25 – 01:40:37.

(b)     To afford all persons a full opportunity to tell their side of the story before arresting anyone (again, it is Hickman's policy to afford deputies discretion to arrests before conducting reasonably thorough investigations).  See Day 1, 01:40:38 – 01:40:56.

(c)     To confiscate relevant evidence, so it can be preserved (so that the Defendant can inspect it under the adversarial process).  See Day 1, 01:40:56 – 01:41:45.

23.     This is relevant testimony, because it demonstrates that Boone County – under Hickman's

leadership – had an official policy of violating suspects' right to only be arrested with probable

cause.  See *Kuehl v. Burtis*, 173 F. 3d 646, 651 (8th Cir. 1999) ("law enforcement officers have a

duty to conduct a reasonably thorough investigation prior to arresting a suspect") and *White v.*

*McKinley*, 519 F. 3d 806, 813 (8th Cir. 2008) (holding that nonconfiscation of relevant evidence

by police counts as a *Brady* violation).

### Morris Davis

24.     The Magistrate Judge – without any excuse, other than malice (See ¶ 13(d)(i) of this

Objection) – omitted the following relevant testimony from his report:

25.     Davis testifies that, in his entire, three-year stay at the Boone County Detention Center,

he never once saw a jail guard be disciplined in any capacity for any act of misconduct.  He

states that, 99% of the time, jail guards would take the grievances filed against them, wad them

up, and throw them in the trash.  See Day 1, 05:05:44 – 05:06:18.

26.     Davis testifies that he saw numerous instances of inmates – including himself – be

harassed, bullied, and threatened by numerous jail guards, *including* Jason Day himself!  Some

examples he gave are listed below:

(a)     ` Some jail guards threw out Davis' own $2,800 pair of dentures, and the jail

administration did absolutely NOTHING to rectify the problem.  See Day 1, 05:01:01 –

05:04:40.

(b)     Jason Day himself – not just a jail guard, but THE top jail guard – once caught Davis

with a stiff pen, and threatened to show "show him what it was made for," effectively

threatening Davis with it.  See Day 1, 04:59:13 – 05:00:47.

(c)     His own sets of glasses were embezzled from his personal property, simply because

the jail staff wanted them. See Day 1, 05:01:25 – 05:02:20.

(d)     Jail guards would repeatedly use tazers and pepper spray to inflict serious physical suffering on inmates, just for fun!  He says that Silva would taze someone just for joking about Silva's body weight, and then stand there and laugh.  See Day 1, 05:04:41 – 05:05:34.

(e)     In one of his affidavits, he testifies that he once bore direct witness to an inmate named Mike was denied his antidepressant medications (leading to two suicide attempts), and was physically assaulted because he complained about a rupture in his stomach lining. See Plaintiff's Exhibit E(1), ¶¶ 7-8.

27.     During cross examination, Davis testified that he was arrested once before.  His crime, apparently, was that he did not stand still and allow his wife to shoot him.  See Day 1, 05:16:39 – 05:17:10.  This, effectively means that Boone County has a tendency to arrest people without regard for probable cause.

28.     This is all very important testimony that establishes municipal liability.

**Bob King**

29.     In addition to the testimony recited by the Magistrate Judge (which was deliberately left incomplete because he hates Plaintiff; see ¶ 13(d)(i) of this Objection), the following statements by Bob King also need to be considered.

30.     Bob King freely admitted that he only investigated Plaintiff's allegations against Jones by questioning a handful of jail guards.  When their statements did not corroborate Plaintiff's testimony, he ended the investigation.  Because, in King's mind, there was absolutely no chance whatsoever that those guards were simply LYING!  Even though, according to him, whenever an inmate complains against another inmate – even when alleging the physically impossible – he has a policy of viewing camera footage (even when the laws of physics render said camera

footage redundant) because it is "more accurate," once the accusation is made against an officer, he will not view camera footage unless witness statements corroborate the accusation.

31.     Despite this admission, King freely admits he did not view the camera footage to determine the verity of Plaintiff's accusation against Jones.  However, he admits that he DID check the camera footage to confirm an allegation from Newman that the mop bucket strainer had defied the laws of physics and *gained* energy on a ricochet, rather than *lost* energy (see Day 1 at 06:25:09 – 06:25:39).  This double standard is important to keep in mind, because it clearly demonstrates King's complete lack of concern for officer misconduct; it shows that King would rather investigate the physically impossible than risk incriminating his law enforcement brethren.

### Jason Beathke

32.     The following testimony was willfully and maliciously (See ¶ 13(d)(i) of this Objection) omitted from the Magistrate Judge's reprot.

33.     Beathke freely admitted that he did not factor Plaintiff's entitlement to the Internet connection – which had been violated – into his arrest decision.  See Day 1, 05:57:11 – 05:57:15.  This constitutes an act of "ignoring potentially exculpatory evidence."

34.     Beathke also admits that he did not confiscate the pillow that was allegedly used as a shield by the alleged victim, even though he clearly considered it to be "relevant evidence" by nature of the fact that he photographed it.  See Day 1, 06:11:29 – 06:13:48.  This prevented Plaintiff from being able to examine the evidence himself in the hopes of finding some rebuttal evidence (such as... fingerprints or the pattern the blood splattered on).  This constitutes a severe due process violation under *White v. McKinley*, 519 F. 3d 806, 813 (8th Cir. 2008).

### Tina Avey and Brandon Starnes

35.     The Magistrate Judge willfully and maliciously (See ¶ 13(d)(i) of this Objection)

exempted the following testimony from his Report:

36.     Tina Avey testified that she did not remember the incident where she placed Plaintiff on lockdown for filing grievances that met her personal definition of "disrespectful." However, Brandon Starnes testifies that he *does* remember the incident.

37.     Her lack of memory of the incident does not mean she did not do it.  Rather, it means the complete opposite:  It means that she has no rebuttal testimony.

38.     In addition, she *did* testify that she acknowledges that Plaintiff has the right to file grievances, and she also acknowledges that this right to does end if she disagrees with the grievances being filed.  See Day 1 at 06:59:34 – 06:59:47.

39.     Now, take this acknowledgment recited in ¶ 37 of this Objection, and combine it with Brandon Starnes testifying that it did indeed happen, and we come to only one conclusion:  Avey put Plaintiff on lockdown in retaliation for filing grievances she disapproved of, and she did so ***squarely in the knowledge that her actions were patently in violation of Plaintiff's First Amendment rights!!!!!***

40.     This is extremely important testimony, because it shows that the jail guards not only have a custom of ignoring inmates' constitutional rights, but because Brandon Starnes so freely admits to this in open court, it also proves that, in their opinion, violation of inmates' rights is no big deal!  It's just another day at the office to them!

### Tim Roberson

41.     The Magistrate Judge willfully and maliciously (See ¶ 13(d)(i) of this Objection) exempted the following testimony from his Report:

42.     Where Roberson, upon reviewing Plaintiff's Exhibit D(1)(e), and determining that this was not a complaint, but rather, a simple disagreement with Bearthky's decision, it is important

to note that this Complaint against Bearthky stated, among other things, that the arresting officer conducted only a four-minute investigation into the matter (meaning that he could not possibly have conducted a "reasonably thorough investigation," as is required by *Kheul v. Burtis*), as well as held a bias in his friend's favor.

43.     Despite these two accusations, Roberson freely admitted that, even if he had seen this paper before, he still would not have investigated the allegations, as he did not believe that these allegations constituted grounds for disturbing the arrest.

44.     Granted, the allegation of the four-minute investigation ended up being inaccurate, but that is beside the point.  The point is, by Roberson own admission, even if it was true, he would still have acted with deliberate indifference.  ***BY HIS OWN ADMISSION!!!!!***

### Rita Stebbins

45.     For the most part, the Magistrate Judge's recital of evidence is fine, and is missing only one detail:

46.     The Magistrate Judge recites "Despite being flimsy, Rita testifies that she believes the knife was capable of inflicting serious physical injury.  She also testifies that the Plaintiff has no background in the use of weapons."

47.     The Magistrate Judge, in making these two statements, apparently seem to treat these two statements as if they were separate from each other. They were not.

48.     Rita Stebbins testified that the knife was readily capable of inflicting serious injury, as long as it was being wielded by a sufficiently-skilled swordsman.  It was in response to that condition – the skill of the wielder – that Plaintiff asked her if he had any background in the use of weapons, to which she conceded he did not.

49.     As a result, her testimony should be construed thusly:  The knife – in Plaintiff's hands –

did not meet the definition of a deadly weapon.

50.    Furthermore, the Magistrate Judge failed to mention that Rita Stebbins testified that Plaintiff *does not lie*.  If Plaintiff states that he was framed for the attack or abused in jail, it is because he truly believes the things he is saying.  This is important to corroborating Plaintiff's testimony and bolstering is credibility, and – coupled with some testimony given by the Magistrate Judge himself – will prove that Plaintiff is telling the truth.

51.    Next, Rita Stebbins testified that, a few weeks prior to Plaintiff's arrest, Deputy Beathke responded to one of Plaintiff's calls where he tried to complain about some excessively loud music which he argued was harassment.  She testifies that Beathke was extremely unprofessional in his handling of this response, even yelling and cussing at Plaintiff when Plaintiff simply asked to get a word in edge-wise.  She agreed with Plaintiff that Beathke's response was "Ok, first of all, no you can't, alright?!  Don't talk back!  I came here to help you, alright?!  You called me!"

52.    Rita Stebbins also testifies that Jason Beathke knew – and was friends with – Plaintiff's parents prior to the arrest.

53.    All of this testimony is extremely important to entitling Plaintiff to a jury trial on the issue of persecution.

**Jason Jones**

54.    Last but not least, the Magistrate Judge willfully and maliciously (see ¶ 13(d)(i) of this Objection) the following testimony from Jason Jones:

55.    First of all, Jones himself could not keep his story straight.  On at least two occasions, he changed his story when it was clear that the evidence that was already presented did not corroborate his initial version of events.

(a)    He initially stated that Plaintiff's lawsuit against him was frivolous because Plaintiff

sued Jones "for three hundred and six million dollars." See Day 2 at 01:16:20 – 01:16:29.

However, when the evidence that had already been presented showed that Plaintiff had

revoked that portion of his demand *before Jones had even been served with process in that

case*, let alone filed his Answer to Complaint, then Jones suddenly changed his story to say

that "your whole aspect of suing me ***in any regard*** is frivolous." See Day 2 at 01:16:29 –

01:20:59.

      i.     First of all, this would be inadmissible for purposes of proving that Plaintiff's

      lawsuit against Jones was not a "statutorily protected activity[1]," since, unlike the damages

      amount, this is 100% opinionated and thus is inadmissible under Federal Rule of

      Evidence #701.

      ii.     However, the testimony is still admissible – not to prove or disprove "statutorily

      protected activity," but for purposes of discrediting the witness.  The witness was ***not

      keeping his story straight!!!!!***  At this point, a reasonable jury could conclude that

      NOTHING he has to say carries ANY credibility, whatsoever.

(b)     Also, he testified and stated that he viewed the camera footage "thirty times" and

consistently found that the mop bucket strainer which injured Plaintiff had *deflected* off of

Newman's hands, instead of it being thrown by him.  (See Day 2 at 01:34:56 – 01:35:24, and

again at 01:36:04 – 01:36:14). However, when Plaintiff played the footage – just *one time*, let

alone thirty – and it clearly showed Newman *throwing* – not deflect – the mop bucket strainer

in Plaintiff's face, then Jones changed his story, and said that he believes Newman was

morally justified in throwing the mop bucket in Plaintiff's face, as retaliation for the supposed

toilet brush strike (See Day 2 at 01:52:49 – 01:54:21).

---

1   "A person cannot show that he engaged in a statutorily protected activity without first demonstrating that he had
a good faith reasonable belief that the alleged retaliator was engaging in discriminatory activity." See *Amir v. St.
Louis University*, 184 F. 3d 1017, 1025 (8th Cir. 1999).

i.    It is important to understand the significance of this contradiction.  Plaintiff had accused Jones of directing the inmate harassment for that week.  This means that Jones, more than anyone else testifying at the hearing, had a motive to cover up for Newman's actions.

ii.    It would have been fine if Jones had maintained a consistent story that Newman was morally justified in his retaliation.  Sure, the LAW would not have provided a defense to his conduct[2], but Jones would still have the absolute right to *sympathize* with Newman.

iii.    However, if that were the case, why would Jones need to make a false statement about what he saw on the camera "after viewing it thirty times?"  What incentive could he possibly have for lying about that?

iv.    There is only one incentive he could possibly have:  He was covering for Newman ... because Newman was covering for him!  He lied, because he knew the truth would incriminate him.

v.    It does not matter if his new story was equally as legitimate as his former story.  It's a matter of principle: There should not have even been a "new" or "former" story to begin with.  Whether the revised story is more probable than the original one is irrelevant: He still changed his story on two occasions, and as a result, a jury could reasonably assume that EVERYTHING in his testimony is a lie unless it is backed by hard evidence!

56.    Furthermore, Jones testified concerning the request he made for minimum contacts.

---

2   Newman waited until several minutes after this supposed toilet brush strike happened, before he retaliated, which strips him of his entitlement to the "provocation" defense as a matter of Arkansas criminal law.  See, Arkansas law provides no defense for an attack that was done in retaliation for another, previous attack; at best, Arkansas law would allow force used to TERMINATE the commission of otherwise unlawful force, but NOTHING in Arkansas law (or the laws of ANY STATE, for that matter) provide for the use of force, simply for revenge.

Specifically, he makes it abundantly clear that he made this request "the first day" that Plaintiff

was incarcerated (See Day 2 at 01:23:03 – 01:23:18).  However, the arrest report – introduced as

Plaintiff's Exhibit L(1)(b) – clearly says that Plaintiff's first day incarcerated was November 25,

2011 (because Plaintiff was *arrested* on November 24, but that was less than two hours before

midnight, so it hardly counts), whereas the order for minimum contacts – which Jason Day states

was granted the same day the request was made (see ¶ 20 of this Objection) – was dated on

November 26, 2011.  As you can see, this is a clear contradiction, which means that the facts of

this case ARE NOT CLEARLY ESTABLISHED!

57.     Speaking of the minimum contacts request, that is probably the most damning thing Jones

said at the entire evidence hearing.  In his Report & Recommendation, the Magistrate Judge did

indeed state that "Jones knew Stebbins had filed a number of lawsuits," but this is glossed over,

and the Magistrate Judge fails to acknowledge just what that means.

   (a)     Jones knew about Plaintiff's entire litigation history, not just the lawsuit filed against

   him.  This, of course, begs the question of ... how in God's holy name did the Defendants

   even KNOW about Plaintiff's lawsuits?  Yes, Plaintiff's litigation history is public record, but

   public *record* and public *knowledge* are two completely different things.

   (b)     The fact that Jones knew about Plaintiff's *entire* litigation history is evidence that the

   entire incarceration was just a sham.  People do not just randomly look up the litigation

   histories of other people.  Instead, Jones had no reason for knowing about Plaintiff's entire

   litigation history, *except* that he was so traumatized by Plaintiff's lawsuit that he decided to

   follow everything Plaintiff was doing.

   (c)     By confessing that he knew of Plaintiff's litigation history, he has effectively

   confessed to the felony of "stalking."  What little credibility with a jury that might have

remained after his inconsistencies (as described in ¶ 55 of this Objection) would certainly have been shot dead at THIS point.

58.    All of this testimony should have been included.

## ARGUMENT

59.    Now that the Magistrate Judge's recital of the witness's testimonies has been corrected, Plaintiff will now explain how these corrected testimonies entitle Plaintiff to a jury trial on this matter.

60.    For the reasons set forth below, the Magistrate Judge's Report & Recommendaiton should be overridden.

### Applicable Law

61.    First, let us establish the main laws which govern this case.  In this section, Plaintiff will state the legal principal in the paragraph, and then, in the sub-paragraphs, he will cite the case law which establishes these legal principles.

62.    **Legal Principle No. 1: "Policy Liability"**  Municipalities can be held liable for the actions of their officers if those actions are taken pursuant to official written policies that are, on their face, unconstitutional.

(a)    Elder-Keep v. Aksamit, 460 F. 3d 979, 986-987 (8th Cir. 2006) (cited by the Magistrate Judge himself)

(b)    Kuha v. City of Minnetonka, 365 F. 3d 590, 604 (8th Cir. 2003)

(c)    Jane Doe A., By through Jane Doe B v. Special Sch. District of St. Louis County, 901 F.2d 642, 645 (8th Cir. 1990)Crawford v. Van Buren County, Ark., 678 F. 3d 666, 669 (8th Cir. 2012).

(d)    Jenkins v. County of Hennepin, Minn., 557 F. 3d 628, 634 (8th Cir. 2009)..

63.     **Legal Principle No. 2: "Pervasive Custom Liability"** Municipalities can be held liable for the actions of their officers if the actions are so common, and so pervasive, that they effectively have *become* the municipality's policies, even if they contradict the written policies.

(a)     *Crawford v. Van Buren County, Ark.*, 678 F. 3d 666, 669 (8th Cir. 2012)

(b)     *McGautha v. Jackson County, MO. Col. Dept.*, 36 F. 3d 53, 56-57 (8th 1994)

64.     **Legal Principle No. 3: "Single Victim Custom Liability"** Municipalities can be held liable for the actions of their officers, so long as enough officers perform violations on a single victim – without the need to show that others have been similarly violated – as long as the violations occurred over a sufficiently long period of time that the policy-making officials had an opportunity to learn of the conduct.

(a)     *Johnson v. Douglas County Medical Dept.*, 725 F. 3d 825, 829 (8th Cir. 2013)

"To be sure, multiple incidents involving a single plaintiff could establish a "custom" if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials."

65.     **Legal Principle No. 4: "Lack of Supervision Custom Liability"** A municipality cannot escape municipal liability simply by remaining purposefully unaware of unconstitutional conduct on the part of officers, REGARDLESS of whether or not the municipality was subjectively convinced of the need for supervision (speaking of which, see Legal Principle No. 6: "No Good Faith Defense").

(a) *St. Louis v. Praprotnik*, 485 US 112, 127 (1988)

"First, whatever analysis is used to identify municipal policymakers, egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine. Relying on the language of § 1983, the Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a `custom or usage' with the force of law." Adickes v. S. H. Kress &

Co., 398 U. S. 144, 167-168 (1970). That principle, which has not been affected by Monell or subsequent cases, ensures that most deliberate municipal evasions of the Constitution will be sharply limited."

(b) *Harris v. City of Pagedale*, 821 F. 2d 499, 508 (8thCir. 1987)

"Where it becomes clear that a police force needs close and continuing supervision because of a known pattern of misconduct, and the municipality fails to provide such supervision, 'the inevitable result' is a continuation of the misconduct."

(c) *Herrera v. Valentine*, 653 F. 2d 1220, 1224 (8thCir. 1981)

"[A] municipality's continuing failure to remedy known unconstitutional conduct of its police officers is the type of informal policy or custom that is amenable to suit under section 1983."

66. **Legal Principle No. 5: "Single Incident Municipal Liability"**  Municipal liability can indeed result from a single, isolated instance, as long as the instance is taken by an officer with the highest authority to determine the policy for that particular governmental area.

(a)    *Crawford v. Van Buren County, Ark.*, 678 F. 3d 666, 669 (8th Cir. 2012)

"Although rare, a public official's single incident of unconstitutional activity can establish the requisite policy if the decision is `taken by the highest officials responsible for setting policy in that area of the government's business."

(b)    *St. Louis v. Praprotnik*, 485 US 112, 123 (1988)

"We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."

(c)    *Pembaur v. Cincinnati*, 475 US 469 (1986)

""[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances ... Monell's language makes clear that it expressly envisioned other officials whose acts or edicts may fairly be said to represent official policy, and whose decisions therefore may give rise to municipal liability under § 1983."

67. **Legal Principle No. 6: "No Good Faith Defense"**  Whenever municipal liability is sought under Legal Principal No. 4, "good faith" is not a defense to municipal liability; what

matters is whether the investigation into the alleged misconduct was competent, not whether the

policymaking officials acted with good faith.

(a)    *Owen v. Independence*, 445 US 622 (1980)

(b)    Veneklase v. City of Fargo, 248 F. 3d 738, 753 (8th Cir. 2001) ("A municipality faced

with a § 1983 action cannot plead qualified or absolute immunity, nor is the good faith of its

officers a sufficient defense.")

(c)    *Veatch v. Bartels Lutheran Home*, 627 F. 3d 1254, 1259 (8th Cir. 2010) ("[A]

municipality does not enjoy qualified immunity from liability based on the good faith of its

officials")

68.    **Legal Principle No. 7:  "Definition of Deliberate Indifference"**  In federal "municipal

liability" case law, "'Deliberate indifference entails a level of culpability equal to the criminal

law definition of recklessness, that is, a prison official `must both be aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference."

(a)    *Jenkins v. County of Hennepin, Minn.*, 557 F. 3d 628, 632 (8th Cir. 2009)

(b)    *Bender v. Regier*, 385 F. 3d 1133, 1137 (8th Cir. 2004)

(c)    *Farmer v. Brennan*, 511 US 825, 837 (1994)

69.    **Legal Principle No. 8:  "Element Creation"**  A Court cannot create a brand-new

element to a legal cause of action that does not already exist in statute, even if said new element

appears, on its face, to be necessary under the Absurdity Doctrine.

(a)    *Shaver v. Independent Stave Co.*, 350 F. 3d 716, 723-725 (8th Cir. 2003) (reversing

summary judgment against plaintiff, which was entered on the grounds that the plaintiff

purposefully sought the adverse action, which was NOT an element of the offense).

70.    **Legal Principle No. 9: "Failure to Raise Means Waiver"**  A Defendant who does not

raise an affirmative defense in their Answer to Complaint waives that Defense.

(a)    Fed. R. Civ. P. 8(c).

(b)    *Sherman v. Winco Fireworks, Inc.*, 532 F. 3d 709, 715 (8th Cir. 2008) ("Generally,

failure to plead an affirmative defense results in a waiver of that defense")

(c)    First Union Nat. Bank v. Pictet Overseas Trust, 477 F. 3d 616, 662 (8th Cir. 2007)

("The Supreme Court has indicated that the Rule 8(c) pleading requirement is intended to

give the opposing party both notice of the affirmative defense and an opportunity to rebut it")

71.    With these legal principles established, we can now turn to the reasons why the

Magistrate Judge's finding that Plaintiff's evidence is insufficient is wrong:

### Recital of Magistrate Judge's Arguments

72.    In his Report & Recommendation, the Magistrate Judge makes the following arguments

as to why Plaintiff's claim should be dismissed with prejudice:

73.    First, because Plaintiff apparently did not request any specific accommodations, his claim

that he was unfairly punished for his disability must fail.  Why?  Umm... good question!  The

Magistrate Judge never once cites a single, solitary legal authority to set this law, and Plaintiff –

despite numerous searches – has been unable to find any legal authority that touches upon this

matter.  Oh, Plaintiff was able to find plenty of legal authorities stating that Plaintiff must initiate

some sort of communication with the organization responsible for providing the accommo-

dations, in order to communicate that he *needs* accommodations, but nowhere was Plaintiff able

to find a single, solitary legal authority stating that a disabled person had to request an

accommodation *even when the need for accommodations was obvious*!

74.    Next, the Magistrate Judge stated that the "undisputed" testimony revealed three things:

75.     Last but not least, the Magistrate Judge states that Plaintiff failed to show "any evidence" of any unconstitutional policy or custom.

76.     All three of these arguments are either patently against the law, or ignore about half of the evidence presented at the hearing (evidence Plaintiff had to spend thirteen pages reminding the Court about).

### Failure to Request Accommodations

77.     The Magistrate Judge says that Plaintiff's ADA claim should fail because he did not make a request for any specific reasonable accommodation that was redundant of common sense. Assuming Plaintiff even raised a "failure to accommodate" claim at all (see ¶ 4(c) and ¶ 5(b) of this objection), the Magistrate Judge's arguments are still frivolous.

78.     First of all, keep in mind Legal Principle No. 9: The court has no authority to entertain affirmative defenses raised for the first time at an evidence hearing, when the Defendants failed to preserve that defense by pleading it in their Responsive Pleading.

79.     The Defendants never raised this affirmative defense until the day of the evidence hearing.  In their two-page Answer to Complaint (see Doc. 20), they raised only two types of defenses:  Sovereign immunity and the defenses under the Prison Litigation Reform Act.

80.     The Plaintiff's failure to request reasonable accommodations was not listed in their Defenses, and at no point did the Defendants ever file any motion with the Court for leave to amend their Answer to include this defense.

81.     Therefore, this defense is waived pursuant to Legal Principle No. 9, as Plaintiff never had an opportunity to collect evidence concerning this claim.

82.     In addition, please keep in mind Legal Principle No. 8:  The Court cannot create brand new elements to a cause of action that are not present in the statute.

83.     The statute does not require, as an essential element, that the disabled person must have requested a specific reasonable accommodation that was denied.  That is simply NOT listed in the statute as an essential element.  Nor has the Magistrate Judge even so much as *attempted* to cite any case law whatsoever to support this legal argument.

84.     Instead, the essential elements are A) that the Plaintiff has a disability, B) reasonable accommodations were *possible*, and C) no accommodations were provided.

85.     Rather than putting the entire burden on the Plaintiff, case law surrounding *employment* discrimination (to the extent that it can give guidance to the Court, under the doctrine of *in pari materia*) seems to suggest that the formation of reasonable accommodations is in fact a two-way street.  Those responsible for providing the accommodation are expected to *work with the disabled person* and come up with a mutually-beneficial and efficient accommodation that works for both parties.

(a)     To support this argument, please see the following webpage:

http://www.eeoc.gov/policy/docs/accommodation.html#requesting

"Example A: An employee tells her supervisor, "I'm having trouble getting to work at my scheduled starting time because of medical treatments I'm undergoing." This is a request for a reasonable accommodation.
...
Example C: A new employee, who uses a wheelchair, informs the employer that her wheelchair cannot fit under the desk in her office. This is a request for reasonable accommodation.

...

While an individual with a disability may request a change due to a medical condition, this request does not necessarily mean that the employer is required to provide the change. A request for reasonable accommodation is the first step in an informal, interactive process between the individual and the employer."

(b)     Using the doctrine of *in pari materia*, there is no reason to believe that it is 100% the responsibility of the disabled person to request a specific reasonable accommodation.

(c)      See what happens when the Plaintiff is given adequate notice on a claim or defense, and is able to collect evidence for it?  Give Plaintiff adequate notice of a claim, and he can offer some powerful counter-arguments against it!

86.    Be that as it may, one way or another, that does not change the fact that, to cause an ADA claim to fail based on the failure to satisfy an essential element that simply IS NOT IN THE STATUTE is not allowed.  Plaintiff is entitled to proceed on this claim (assuming he even raised it in the first place).  Period.

**It is greatly disputed if the minimum contact order was adhered to.**

87.    The Magistrate Judge states that the "undisputed" testimony is that Jones adhered to his own request for minimum contacts.

88.    The only way the Magistrate Judge could possibly find that this testimony is "undisputed" is if he retroactively decided that all the testimony that, in fact, disputed it was inadmissible (which he is most likely doing; see ¶ 13(d)(i) of this Objection).

89.    The Magistrate Judge himself acknowledges that the following testimonies were offered:

(a)      Plaintiff (whose testimony the Magistrate Judge has repeatedly stated he must believe) testifies that Jones harassed Plaintiff at literally every opportunity, especially over the Intercom system.

(b)      Morris David testifies to a particular incident occurring on December 14, 2011 that, without a shadow of a doubt, would constitute a violation of the minimum contact order.

90.    There are multiple witnesses, giving contradictory testimony.  That is the very DEFINITION of a "dispute."  It is, very much so, disputed that the Defendants engaged in a pervasive pattern of harassment, bullying, and threatening.

91.    Therefore, Plaintiff is entitled to a jury trial on this matter.

**It is *greatly* disputed whether the CID investigated the matter.**

92.     When the Magistrate Judge says that it is "undisputed" that the allegations against Jones

and the mop bucket incident were "turned over to the CID for investigation," it is unclear to

Plaintiff exactly what the Magistrate Judge is actually saying.  Is he saying that, as long as the

disputes were "turned over to" the CID, the county is absolved of liability, no matter how

insufficient the CID's investigation was, or is he saying that he believes it is undisputed that the

CID performed an adequate investigation?

93.     If the Magistrate Judge is suggesting the former, this argument must fail as a matter of

law.  Legal Principle No. 5 very clearly states that municipal liability cannot be avoided simply

by acting in "good faith."  Rather, according to Legal Principle No. 4, municipal liability is

determined, not by the good faith of the investigation, but the *competence* thereof!

94.     If Bob King only asked a handful of witnesses – but not all of them – then this is an

incompetent investigation.  Good faith is irrelevant.  Furthermore, if Bob King knew about – and

subsequently ignored – the videotaped account that Plaintiff told him about, this is "deliberate

indifference."

95.     If the Magistrate Judge is suggesting the latter, however, then it is *greatly* disputed that

the investigation was sufficient.  Although the Defendants claim that both the mop bucket

incident and the allegations regarding Jones' conduct were ***submitted to*** the CID for

investigation, the Defendants' own witnesses freely admit that the investigation never got past

preliminary stages.

96.     The Defendants' own CID Captain – Bob King – freely admitted that he only asked a

handful of witnesses (not even all of them) if Plaintiff's allegations were true, and made no

investigation beyond that.  By his own admission, he never even *attempted* to view the

incontrovertible camera footage which was listed specifically by the precedent of *Kheul v. Burtis* as something that would override his discretion to determine the credibility of witnesses.

97.     This lack of thorough investigation demonstrates the CID's "deliberate indifference" to Plaintiff's plight, according to the definition given by Legal Principle No. 7.  After all, King – by his own admission – was plainly aware of camera footage that would have instantly disposed of the case (that is the "facts from which the inference could be drawn that a substantial risk of serious harm exists"), and made the conscious choice to ignore it for no other reason than... just because.  This amounts to the criminal definition of "recklessness," and thus meets the identical standard for "deliberate indifference" to the evidence supporting Plaintiff's claim.

### There indeed was "any evidence" of an unconstitutional policy or custom.

98.     The Magistrate Judge states that Plaintiff has not produced "any evidence" of a policy or custom.  This is patently false.  There is no possibility that the Magistrate Judge is acting in good faith here (see ¶ 13(d)(i) of this Objection); he is simply lying.

99.     The evidence hearing indeed contained "any evidence" of official policy, according to Legal Principle No. 1.  Specifically ...

(a)     ¶¶ 22, ¶¶ 30-31, and ¶¶ 42-44 of this Objection document testimonies given where the witnesses – all policy-making officials within Boone County – freely admit to a policy of handling arrests and citations that is blatantly in violation of probable cause case law (see *Kuehl v. Burtis*, 173 F. 3d 646, 650-651 (8th Cir. 1999)).

(b)     Also, ¶ 25 shows evidence of a county custom to arrest anyone and everyone, even if they are not under suspicion of any crimes.

(c)     In addition to this, ¶ 18 shows that Jason Day freely admits to an official policy of allowing jail guards to harass and threaten inmates all they want, as long as they look but

don't touch."

100.    Furthermore, ¶¶ 13-16 and ¶¶ 25-27 document a custom on the part of the jail, in accordance with Legal Principal No. 2. These incidents show a clear "pattern of misconduct so pervasive among the non-policy making employees of the municipality as to constitute a custom or usage with the force of law."

101.    Furthermore, ¶¶ 36-40 show the jail guards themselves admitting that the events Plaintiff complains about are so commonplace that it does not even phase the jail guards anymore. This means that the jail guards themselves are admitting that this conduct is extremely common. This obviously constitutes evidence of Jail Custom, pursuant to Legal Principal No. 2.

102.    Also, ¶¶ 13-16 also establish custom liability under Legal Principle No. 3. Plaintiff had been harassed and badgered by just about every jail guard on the payroll, and every time Plaintiff tried to complain about it to Jason Day, he either would not do a blasted thing about it, or – such as in the case of Exhibit E(5) – would not allow Plaintiff to even *air* his grievance!

103.    Last but not least, ¶¶ 30-31 demonstrate custom liability pursuant to Legal Principle No. 4. Bob King – by his own admission – failed to adequately investigate charges against Jones, simply because other jail guards – who just as easily could have been lying – said he did not do it. This creates municipal liability under Legal Principle No. 4, and good faith is irrelevant, under Legal Principle No. 5.

104.    Plaintiff can certainly accept that the Magistrate Judge could find all this evidence to be unpersuasive. However, by the Magistrate Judge's own admission, his personal assessment of the weight of the evidence is irrelevant. On numerous occasions, both before and during the evidence hearing, he reminded the parties that the purpose of that hearing was NOT to try the facts, but rather, to determine if there are any facts to be tried. Simply because the Magistrate

Judge finds this evidence to be unpersuasive, that does NOT give him the right to omit it from the "background" section of his Report & Recommendation.

105.   Rather, the Magistrate Judge has absolutely no excuse – other than sheer malice – for omitting these facts from his Report, because he himself admitted that these facts were relevant to proving municipal liability.  See ¶ 13(d)(i) of this Objection.  For the Magistrate Judge to say that Plaintiff has not produced "any evidence" for this claim is an outright lie.

106.   No matter how you slice it, no matter what theory you base municipal liability on, Plaintiff has clearly demonstrated "any evidence" of a policy or custom of ignoring complaints that inmates make against jail guards, and complaints that arrestees make against deputies.  A reasonable jury could very easily find that there is such a custom.

## REMAINING ISSUES

107.   Plaintiff does not want the District Court to find that Plaintiff's objections have merit, but still throw the case out anyway, since there is apparently still no evidence of any constitutional violations in the first instance.  Plaintiff knows how the Courts think; if Plaintiff does not object to that, they will assume that Plaintiff *cannot* object to it (even though he's not supposed to be required to object to it if the Magistrate Judge does not include it in his Report).

108.   Thus, Plaintiff will re-argue, *de novo*, why he should be allowed a jury trial on all four matters that are actually before the court (notwithstanding the made-up claims that the Magistrate Judge pulled out of thin air, as described in ¶ 5 of this Objection).

### Conspiracy to arrest for purposes of persecution

109.   First, Plaintiff will address the most glaring issue, the one which challenges the very legality of the incarceration itself, not simply the conditions of Plaintiff's confinement.

110.   Plaintiff accuses Boone County, first and foremost, of arresting Plaintiff in the first place

for the sole purpose of giving a platform to prosecuting attorney Wes Bradford so he could

persecute Plaintiff for his ADA Discrimination Lawsuits.

111.   Plaintiff's entitlement to a jury trial on this issue is governed by two precedents:  The

precedent of Santiago v. Blair, 707 F. 3d 984, 991(8th Cir. 2013) and White v. McKinley, 519 F.

3d 806, 816 (8th Cir. 2008).

112.   First, the case of *Santiago v. Blair* sets forth the essential elements that Plaintiff must

demonstrate in order to prevail on a claim of First Amendment Retaliation:

> "To prevail on a § 1983 claim for retaliation in violation of the First Amendment,
> Santiago must demonstrate (1) that he engaged in a protected activity; (2) that the
> government official took adverse action against him that would chill a person of
> ordinary firmness from continuing in the activity; and (3) that the adverse action
> was motivated at least in part by the exercise of the protected activity."

113.   Plaintiff has absolutely shown evidence of all three essential elements listed in *Santiago*

*v. Blair.*

(a)     First of all, Plaintiff has shown plenty of evidence that he has engaged in statutorily

protected activities.  Plaintiff's Exhibit Set K[3] was dedicated to showing all the ADA

discrimination lawsuits he had filed, and Plaintiff's Exhibit Set J[3] is dedicated to showing

that, despite the fact that he has filed a large *number* of lawsuits, none of them were

frivolous.

(b)     Furthermore, the "adverse action" complained about here – the criminal proceedings

that were officially supposed to be in connection with domestic battery – is not in dispute at

all in this case.  Nobody denies that Plaintiff was arrested.  The Defendants deny causal

connection, of course, but they do not deny the element of "adverse action."

(c)     Plaintiff introduced Exhibit Set L[3] for the purposes of proving that the adverse action

---

3   Indeed, this was the reason Plaintiff separated the exhibits into "sets" and "subsets."  He knew he had a lot of
exhibits, so he separated them into smaller, more manageable "sets," based on what they were designed to prove.
That way, Plaintiff could simply point to entire sets of exhibits, and say "These exhibits prove THIS claim."

spoken of in sub-paragraph (b) of this paragraph was done for the purposes of persecuting

Plaintiff for the lawsuits spoken of in sub-paragraph (a) of this paragraph.

114.   In addition to the evidence provided in Plaintiff's Exhibit Set L[3], the case of *White v.*

*McKinley* sets for the standard of evidence for each claim that entitles Plaintiff to a jury trial:

> "Viewing the facts in a light most favorable to [the Plaintiff], a reasonable juror
> could find that [the Defendants] reached a meeting of the minds to withhold
> exculpatory evidence from prosecutors and [the Plaintiff]. White offers evidence
> that Tina and Richard were romantically involved shortly after White was
> accused, and there is also evidence that Tina and Richard knew each other before
> the abuse allegations even surfaced. Some evidence suggests that Richard
> reviewed and returned the potentially exculpatory diary to Tina and that the diary
> then disappeared. There is also evidence that Tina stood to gain financially from
> White's conviction. Because the elements of conspiracy are rarely established
> through means other than circumstantial evidence, and here there is sufficient
> evidence to support a reasonable inference of conspiracy, summary judgment was
> not appropriate."

115.   In other words, the 8th Circuit has ruled that, in order to receive a jury trial on the matter,

Plaintiff must, at the very least, demonstrate the following things:

(a)   Withholding – and subsequent destruction – of potentially exculpatory evidence.

(b)   The arresting agency already knew, personally, one of the parties involved in the

arrest, and

(c)   A personal interest in the Plaintiff being convicted.

116.   Plaintiff has indeed demonstrated all of these things.

(a)   For starters, Jason Beathke freely admits that he did not take the pillow into evidence,

and instead left it to the alleged victim so he could destroy potentially exculpatory evidence

using his washing machine.  This clearly satisfies the element referenced in ¶ 116(a) of this

Objection.

(b)   Next, Plaintiff has shown not one, but two pieces of evidence that could satisfy the

element spoken of in ¶  112(b) of this Objection:

      i.      First, ¶ 52 shows evidence that Beathke and the alleged victim were already friends before the arrest.  This satisfies the element demonstrated in ¶ 116(b) of this Objection.

      ii.     Also, ¶ 51 of this Objection demonstrates that Beathke already hated Plaintiff prior to the arrest, despite having no known motive for it unless you consider that he was planning Plaintiff's arrest weeks in advance.

  (c)     And finally, Plaintiff has shown some circumstantial evidence that Beathke and Plaintiff's father had personal interests in getting Plaintiff arrested:  Because Wes Bradford told them to.  Perhaps they were even blackmailed.

117.    Last but not least, we have the testimony from Jason Jones himself, admitting that he had stalked Plaintiff and researched Plaintiff's litigation history, so he could rub it in Plaintiff's face.

118.    Last but not least, remember that Jason Jones knew about Plaintiff's litigation history, despite having no reason to possibly know about it.  A jury could easily find that as evidence that Jones knew Plaintiff was coming to jail, days (possibly even weeks or months) in advance, and wanted to be ready for him.

119.    All of this, coupled with Hickman's and Roberson's open admission as to the County's official policy to allow officers discretion to violate federal probable cause case law, and we can reach only one conclusion:  Plaintiff is entitled to a jury trial on the issue of whether or not his arrest was designed exclusively for the purpose of persecuting Plaintiff for his lawsuits, and that is all there is to it.

### Jason Jones' harassment

120.    Once again, Plaintiff's entitlement to recovery of damages in this case is governed by the precedent of *Santiago v. Blair*.

121.    Plaintiff has introduced plenty of evidence to demonstrate all three *Santiago* elements.

   (a)    Plaintiff has introduced public records (Exhibit Set A, Subset 1) to prove that Plaintiff

engaged in a statutorily protected activity.  He also produced evidence of multiple grievances

filed while in jail, some of which were against Jason Jones.

   (b)    Morris Davis corroborated Plaintiff's account of what Jones did immediately after the

grievance was filed on December 14, 2011.  Also, Plaintiff has provided testimony (which is,

admittedly, uncorroborated, but that is not relevant for the purposes of determining Plaintiff's

entitlement to a jury trial) that Jones harassment of Plaintiff both preceded, and followed, the

December 14-15, 2011 incidents.

   (c)    The element of "causal connection" falls into place on its own, without the need for

independent proof.  If a jury is willing to believe that the actions spoken of in sub-paragraph

(b) happened at all, then they necessarily must have happened in connection with Plaintiff's

lawsuit against Jones and the jail grievance.

122.    Plaintiff is well aware that the Defendants disagree with the probative value of the

evidence.  However, that does not mean that the case should be summarily thrown out; rather, to

disagree with the probative value of the evidence … that is the very *definition* of a "genuine

dispute of material fact."

123.    Just to make sure this argument sinks in, Plaintiff has demonstrated plenty of evidence to

show that Jones' conduct was representative of a pattern "so pervasive among the non-policy

making employees of the municipality as to constitute a custom or usage with the force of law."

   (a)    About a half a dozen instances demonstrate municipal liability under Legal Principle

No. 3 (municipal liability if a single victim is repeatedly violated).

   (b)    About two dozen instances were testified to by two different witnesses (Plaintiff

himself, and Morris Davis) showing municipal liability under Legal Principle No. 2.

(c)     The jail guards themselves admit that this sort of thing is so common inside the jail, that it no longer phases them.

(d)     Jason Day himself admits that he receives complaints all the time that allege harassment and threats by the jail guards, and admits that he does not concern himself with them unless they allege *physical* abuse.

124.   Again, just because the Defendants disagree with the probative value of this evidence does not mean they are entitled to prevail as a matter of law; it means we need a jury trial to resolve the dispute.

### Discrimination on the basis of disability

125.   Unlike the Magistrate Judge's made-up claim for failure-to-accommodate, Plaintiff has absolutely shown sufficient evidence to entitle him to a jury trial on THIS matter.

126.   There is no need to request "accommodations" when the Defendants' adverse actions are simply … to torment a person because of his disability.

127.   For example,

(a)     to call someone "four-eyes," "retard," "faggot1" or any other derogatory slur that relates to their disability,

(b)     to beat someone up who is a wheelchair, or uses crutches, simply because he can't fight back,

(c)     to taze a deaf person because that deaf person did not hear your order (and, subsequently, failed to comply) to return to his cell,

(d)     to place a person on lockdown because his dislexia caused him to misread a new jail rule, causing him to inadvertently violate the rule,

128.    These are not adverse actions where a "reasonable accommodation" needs to be "requested." These are simply issues of people causing torment to disabled persons, simply by reason of their disabilities.

129.    Plaintiff has given plenty of evidence that he had been repeatedly harassed and tormented by the jail guards – including Jason Day himself – because of his Asperger Syndrome. No accommodations necessary; this is simply discrimination in its purest form. It is the equivalent of harassing a black inmate simply by reason of his being black.

130.    There is no need to "request" any "accommodations" in this situation; this is not a matter of accommodations. This is a matter of … not picking on the disabled. That is NOT an "accommodation."

131.    Therefore, because Plaintiff has shown enough evidence that a reasonable jury could determine that the jail guards – including Jason Day himself – repeatedly punished Plaintiff for having Asperger Syndrome, he is entitled to a jury trial on this matter.

## CONCLUSION

132.    Plaintiff is about to recap the points. Every single one of these points needs to be addressed, in turn, by District Judge Timothy L. Brooks, or else Plaintiff's right to court access would be prejudiced. See Canon 3(a)(2) of the Code of Conduct of United States Judges: "A judge should hear ***and decide*** matters assigned, unless disqualified."

133.    The recap of points are as follows:

(a)    The Magistrate Judge clearly has a bias against Plaintiff, a bias which he has demonstrated on numerous occasions.

(b)    The Magistrate Judge has failed to issue a recommendation on about 2/3 of Plaintiff's claims, instead opting to just make claims up that he can refute, instead.

(c)      The Magistrate Judge completely omitted about a third of the relevant testimony and about half of the relevant exhibits when he lists the testimony of each witness.

(d)      The Magistrate Judge made extremely vague claims about undisputed facts.  It was hard for Plaintiff to even figure out what he was saying in those claims.

    i.      If he is saying that the CID is not required to investigate the matter in order to absolve the County of liability, then this is legally frivolous.

    ii.      If he is saying that the CID thoroughly investigated the matter, then that is greatly disputed.  Why?  Because there is evidence for both sides!  That is the very *definition* of "dispute."

(e)      The Magistrate Judge is attempting to raise a nonexistent essential element to a non-existent "failure to accommodate" claim, despite having absolutely no authority or jurisdiction to create elements out of thin air.

(f)      The Magistrate Judge is entertaining this claim, despite Plaintiff having no opportunity to refute it in the evidence hearing.

(g)      Also, the Magistrate Judge is a filthy liar when he says that Plaintiff has not produced "any evidence" suggesting a policy or custom of violating inmates' rights.  Plaintiff indeed has introduced said evidence.  Just because the Magistrate Judge does not like the evidence does NOT give him the right to omit it from his Report.

(h)      For that matter, the jail guards themselves admit that the type of conduct complained about in ¶¶ 13-16 and 25-27 is so common inside those walls that they honestly do not see the problem.

(i)      Plaintiff has the right to receive a jury trial on all three claims that he actually put before the Court.

i.      Plaintiff has provided public records to show that he engaged in several statutorily protected activites.

ii.      The arrest and pretrial incarceration is not in dispute, and Plaintiff has provided evidence – corroborated by the testimony of a disinterested witness – that Plaintiff was repeatedly harassed, badgered, and threatened by the jail guards, as well as inmates acting under those guards' direct instruction.

iii.      Plaintiff has produced enough evidence (including, but not limited to, a written statement from the prosecuting attorney, making the dismissal of Plaintiff's lawsuits a *quid pro quo* condition to the dismissal of charges) that a reasonable jury could determine that the arrest and subsequent criminal proceedings – which are not disputed – was done in retaliation for Plaintiff's exercise of his right to court access.

iv.      Remember, "the elements of conspiracy are rarely established through means other than circumstantial evidence." See *White v. McKinley*, 519 F. 3d 806, 816 (8th Cir. 2008).  Therefore, some leniency needs to be afforded Plaintiff concerning the probative value of his evidence.

(j)      By the Magistrate Judge's own admission, the mere fact that he disagrees with the probative value of this evidence

134.    Plaintiff will repeat this yet again, because it bears repeated:  The Magistrate Judge is patently ignoring both a substantial amount of evidence, and a majority of Plaintiff's claims, just so he can have an excuse to recommend that "that lawsuit David Stebbins is filing" can get thrown out.

135.    ***LET'S SAY THIS, ONE MORE TIME, JUST IN CASE It DID NOT SINK IN:  THE MAGISTRATE***

# *JUDGE IS A FILTHY LIAR, FRIVOLOUSLY CLAIMING THAT PLAINTIFF HAS NOT SHOWN "ANY EVIDENCE," WHEN HE VERY CLEARLY HAS!  JUST BECAUSE THE MAGIS-TRATE JUDGE MADE THE CONSCIOUS CHOICE TO NOT INCLUDE IT IN HIS REPROT DOES NOT MEAN PLAINTIFF DID NOT PRODUCE IT! THE MAGISTRATE JUDGE IS SIMPLY A LIAR!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!*

136.    Please find, attached to this objection, a statement from a friend of Plaintiffs, begging the court to do the right thing.  What happened to Plaintiff was wrong, and everyone except the Defendants and the Magistrate Judge seem to agree that Plaintiff deserves some justice.

137.    Wherefore, premises considered, Plaintiff hopes (but is not in good spirits, because this Court will always find a way to toss out "David Stebbins" claims) that the Magistrate Judge's frivolous and malicious Report & Recommendation be rejected, and that a jury trial ensue, and any other relief to which he may be entitled.

138.    So requested on this, 24th day of July, 2014.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

Dear U.S. District Court,

My name is ___LARRY   Boyd_____. I am the leader of a PTSD-recovery program that is owned and funded by Church 180, a church that Mr. Stebbins happens to live next door to.

I am writing to you today, at Mr. Stebbins' request, to beg you to afford him a jury trial in his case.

I am well aware of what the Boone County jail put him through. It was not right what happened to him. He was tortured. He was violated.

I have been trying to help him, but he cannot recover as long as he has not yet secured justice in the court system, since he has no chance of recovery as long as he is still dwelling on the issues.

I know David, and I can testify that he is slowly going insane as a result of this injustice! He repeatedly bangs on his walls and yells at the top of his lungs, even though there is no one in his apartment for him to be yelling at. He can often be seen walking around in the parking lot of our church, pacing back and forth, making silent cuss-words with his lips, and raising his arms in front of his face, as if he is reliving memories of being attacked.

It's a miracle he hasn't committed SUICIDE, yet!

He is in *excruciating* emotional agony. Nobody should be expected to endure this type of pain.

He does not deserve the hatred that you and the jail have poured onto him. He is a normal human being, of flesh and blood, and he has been tortured into insanity! The monsters who did this to him need to be brought to justice; they are evil and need to be liable for their actions.

And YOU – the court – are about to let them get off scott free, simply because you don't like Mr. Stebbins. Your magistrate judge has completely ignored about 99% of the evidence that Mr. Stebbins presented at the evidence hearing, and is using THAT to justify his recommendation that Mr. Stebbins has not shown any evidence.

Please, do the right thing. It is heart-wrenching, seeing Mr. Stebbins in so much pain, and being powerless to help him until he can finally obtain justice. Please, give him justice. Give him a jury trial.

_____
(Signature of Wtiness)

LaRBEPh31920@ gmail.com